Good morning, Your Honor. My name is Laura Madiachi of Consul Madiachi Law, and I represent the appellate Frank Cullen. As a housekeeping matter, I do have two enlargements. I would just request the panel's permission. Is it okay if I use them during my argument as I feel they're the two documents that compel the reversal? These are exhibits in the record? They are, Your Honor. They're just two pages from the record. Mr. Noll, I've seen them. I have not seen the blow-offs, Your Honor, but I have no objection. Okay, good. Okay, thank you. I may also reserve two minutes for rebuttal. The civil rights laws of our country are dying in the darkness of the granting of summary judgment motions. Citizens like Mr. Cullen should not be deprived of their day in court because judges are making factual findings. Ms. Madiachi, I totally agree with the editorial statement. Yes. Jury trials are a dying breed if they're not already extinct. What is there on this record that gives rise to material fact, material issue of fact? Yes. The district court made factual findings in this case and told the story from the perspective of the defendant. What the jury did not get to hear was the story from the perspective of the plaintiff, of Mr. Cullen and the appellant. Mr. Cullen worked for this company for 19 years. For 19 years, he had excellent performance reviews. There's no disciplinary actions, no written warnings of any type. In December of 2015, he has to go in for emergency heart surgery. We're aware of the facts. Okay. So the facts, however, I would like to point out, are not accurately recounted by the district court in their opinion. In particular, as we just go to the tail end of it, on March 4, 2016, there was an acquisition. The district court said that three weeks after the acquisition, the plaintiff or the appellant was terminated. It's not true. On March 4, 2016, yes, the acquisition occurred. But the appellant did not, Mr. Cullen did not come back to work until March 18th. When he came back to work, he had restrictions. He had to go to rehab in the morning three days a week for his cardiac rehab. He had to leave early during the day to go home three to four hours a day where he would work from home. He did this for over two weeks, and it was only at that time, according to the defendant, that the decision to terminate him was made. But he returned March 18th and the decision was made April 1st, correct? Well, the specific date of the decision is not known clearly. It's somewhere between March 28th and April 1st, I would say. That's when the decision was made. Why wasn't it July 2015? It was not made in July 2015 because that was just a suggestion of a possibility that maybe there was going to be an elimination of a position. No decision had been made. There's consistency in there as to whether that decision was then or was later, but it seems like the testimony and depositions was that the decision wasn't made until around April 1st. That's exactly right, Your Honor. And if I may, let me point to – actually, right before I get there, let me just background real quickly that the district court did find that Mr. Cullen met his prima facie case, that a reasonable jury could conclude that he was disabled, that he was terminated, and that a reasonable jury could conclude that there was a causal connection between his disability and his termination. You mentioned you're giving pretext. And then the district judge bounces to pretext. And on that concludes as a matter of law that the decision to terminate was made in July of 2015. And so it predated the disability. So how could it be the causal connection? And on that point, it's just wrong. Let me show you. This is the interrogatory response of the defendant during litigation. Is this your chart? It is. This is a wonderful chart, a very, very helpful chart. It should be, Your Honor. This is A350. And if Your Honors can't see that, I do have extra physical copies. But here's what it says about that memo. This is the defendant's own words. Randy Watts noted in a memorandum and report about one year prior to plaintiff's termination that the position may be eliminated. Maybe. Maybe eliminated. Not that there was going to be a termination. And then it says, while this discussion was tabled, the issue eliminating the position of vice president arose again as a result of select medical's acquisition of physios associates. So even according to defendant's own words, the decision wasn't made in July of 2015. There was a memo that noted that maybe and might. But then, in fact, it was tabled. And then the defendant takes a position that arose again only because of the acquisition, which was not until March 4th of 2016 when the acquisition took place. In addition, the deposition testimony of the decision maker. This is the decision maker. Can you reflect for the record exactly where in the appendix these two are? Because the transcript will come through without clarity. Yes. The interrogatory response number four is located on A350. All right. And then this one? And then this is the deposition testimony of the decision maker, Mr. Watts, page 7, line 12, through page 8, line 5, appendix A, 172. And in the deposition, he's asked, who made the decision to terminate Mr. Cullen's employment with select medical? Answer, I did. Anyone else? No. Was Mr. Cullen's performance a factor in the decision to terminate his employment? No. When was the decision made to terminate his employment? It was decided in April 2015-2016. I'm sorry. So he's clarifying, April 2016. So he was notified on April 12th, April 12th, 2016. Can you pinpoint how long before then the decision was made? I would say probably within two weeks prior to that. The decision to terminate him was two weeks prior. Now, six months after his termination, the defendant was given an opportunity to explain their decision to the Equal Employment Opportunity Commission. A charge was filed, and they submitted a position statement. And in that position statement, they said the reason that Mr. Cullen was fired was solely because of the acquisition. At no point in that position statement to the EEOC did they ever say, oh, by the way, we made the decision in July of 2015. It was before he was ever disabled. Therefore, we cannot be liable. Because if that was the truth, that would have been what the first thing that they would have said to the EEOC because it gets them out. But they didn't say that. They've only come out with this latest iteration as the litigation has evolved. And now in Appellee's brief, he is all in, saying the decision was made July 2015, couldn't have been motivated by disability discrimination. This case should be thrown out. And the district court judge, unfortunately, may have just sided with the defense and made factual findings and concluded those inferences in the defendant's favor instead of Mr. Cullen's favor as what should have been done. You seized upon some statements by Mr. Watts, or actually I think it was Mr. Cullen's characterization of them, as to Mr. Watts was perturbed or he finally, I think, said anything can happen. What specifically did Watts do, or what was his conduct towards Cullen that would show there was any problem with the medical leave that he had taken? Mr. Cullen testified in his deposition that there were conference calls that happened before he came back from work where he would say, when are you coming back, I want you to come back. Well, that's a normal question. I was asked that. I was on maternity leave for two weeks and I got questions. Certainly. But the tone, the context, the way in which it is said. But do you have any witnesses to whom Watts spoke or anybody who said anything as to Watts' attitude toward Cullen when he returned? Yes. I mean, Mr. Cullen is going to testify, or you're testifying to that. But do you have any other employees who would say, well, he was perturbed and he said, I can't take this, this is creating a problem, da-da-da-da. They are current employees. We don't have current employees that are going to come in and say that. But we don't need that. Did Watts say something? Yes. Basically validating Cullen's interpretation of the conversation? Somewhere in the brief I read that, that Watts said something basically to suggest that he understood how Cullen could draw that reaction. He did. He did. He said, I understand that that could come across or he could have that interpretation. And that was the feeling that Mr. Cullen had when he was saying those things. If you also think about that if the acquisition was the sole reason the acquisition happens on March 4th, you have a guy that's out with heart condition who has to do cardiac rehab. If that's the true reason, the employer calls the person up and says, don't come back. We've made a decision, it's the acquisition. Instead, they have him come back. And he's back for two weeks. And he's telling them. Two weeks. At that point he wants reduced hours and be able to work from home? Yes. He wants to come in late three days a week. He wants to go home early at least three days a week. He works from home for three to four days a week. He's doing this. He's doing this for over two and a half weeks from March 18th to the end of March when now the employer comes forth and says, we've made a decision to fire you. Judge Prater attributed financial causation to, you know, it made sense from a business standpoint because they'd saved so much money by not having to pay him his salary, which I think was like $206,000, something like that. But then they hired several people, did they not? They hired. And allocated his duties to other people that they hired? They hired multiple people. And they hired people. What the cost difference might have been? Did they spend more money by hiring these people? It's unclear from the record how much, but it would be mathematically impossible to spend less, I believe, because there were so many more people that were brought in. And even after on July 1st, there was another person that was hired within the real estate group there. And the financial issue, that was never raised ever, not in the interrogatory response, not in the EEOC response.  Your best case on temporal proximity as to causation here. Some specific site you're on. I know we cited a lot in our briefs. I mean, there are. I mean, I assume you're saying March 18th to April 1st were thereabouts. Right. Or if it was April 12th and they said two weeks prior, then it's probably towards the end of March. Right. So maybe 10 days, something like that. Yes. Yes. And this also has to do with job performance. And I'm still not sure whether or not job performance was one factor or was not one factor. It's part of the inconsistencies, Your Honor. They're all over the place on it. We just saw the testimony of the decision maker who clearly said no, performance was not a factor in his termination. He was not told a reason, was he? Yes, he was told in the termination meeting, we're really sorry we had to eliminate your position. It's not performance. It's not personal. It's just the elimination of your position. And yet the position was split up among other people. It wasn't really eliminated as such, was it? Exactly, Your Honor. And did you answer Judge Rendell's question about your best case on temporal proximity? I did not.  Sorry, I'll have my brief up there. Okay. Thank you, Your Honor. Good morning. I'm George Knoll. I'm speaking for Apelli Select Medical. The one thing that I asked the court to recognize is that the decision to terminate was a two-part thing. It was initially planned in July 2015 with the Watts memos. Was that a plan? It was a plan that began to be implemented, but when it was a decision to terminate, they used the word replace and transition him out. Those are the words that are actually in the memos. But the timing of it was not in the memos. And that's really what we're arguing about here. The decision to terminate. The Watts memo says outline suggestions, identify areas of improvement. I just have trouble calling it a plan. Well, it's a plan that was then approved by Malatesta, who was Watts' boss, and disseminated to other executives and then implemented. It's not just a document. They implemented it. They hired Scott Mikulich, Pat O'Donnell, and Fran McCaffrey based on these memos. They actually put them into place. Those people are still working there today. Ten people. Would it be relevant to know the cost of that? I'm sorry. I couldn't hear. Would it be relevant to know how much that is costing the company? Well, his salary was right. Judge Randall was right. It's about $206,000 salary and bonus. They spent about the same amount, a little more, I think $220,000 or something, to hire three people. And those three people, they got enhanced performance all across the board from that. So you're saying performance was a factor? Performance was not a determinative factor. He had good employment. Not determinative. It wasn't a factor. Was it one factor? The testimony, they never said that it was determinative. Yes. It was one factor. Watts testifies again. Fred's performance was not a factor in his termination. If you look at the employment reviews previously, they said acceptable performance. But if you look at Randy Watts' memos, he says for this salary, we want excellent performance because he's a vice president, not a lower-level employee. So is that a factor? Is it not a factor? I think you could say fairly that it is a factor, not a determinative one. Randy Watts. When Watts is asked about why, he says to bolster the performance of our groups, decrease in compensation savings, provide more specific level of service. And then he says additional resources so I could provide services to our operation teams. And then he says additional services so I could provide a better level of service to our operation team. And then he says additional resources to provide a better service for our operations team. I'm trying to figure out exactly what the reason was. It sounds like he's parroting this. I don't know whether a jury is going to find a problem with that, but I don't understand what that means. And he says it about six times. No, that's because the discovery, the questions in the discovery were what was the reason. There wasn't one single reason. There were several. No, but this is in his deposition. Yes, but if you look. And he testifies like parroting the same thing, which, you know, What we have to assume here is if a jury, what's going to happen here is if we were to say that this goes to trial, it's going to be Mr. Cullen versus Mr. Watts on the stand. It's going to be how the jury perceives them. Yes, and it was in discovery. But there are multiple reasons. That's why it's so hard to answer what is the reason. Well, there were several. The memos from July 15 reflect several reasons. But behind this, the physiotherapy acquisition. Select is the biggest outpatient therapy company in the country. Novocare is one part of it, not a big part of it. Okay. They acquire companies across the country. It took a year to acquire physiotherapy associates. And that's behind all this. That was the catalyst that determined when to fire Mr. Cullen. They didn't want to fire him immediately because they needed to bring in the new people to see if they could handle the job. And if that worked out the way they hoped it would, as outlined in the memos, then the decision was to replace. Wait, the acquisition of physio just happened just before he was fired. Your Honor, it was a year-long process, spring 15 to spring 16. It was a negotiation, a very big negotiation, and 1,000 or so. But the acquisition wasn't until March of 2016. The signing of the documents. But the talks started a year earlier. Right, but you don't do anything until the documents are signed. And then he returned to work March 18th, and he's fired two weeks later. So, I mean, you can't have figured out how everything's going to work based on physio. Plus, there were only eight select employees fired in, like, 80? 87 or so, yes. That's proof that he wasn't singled out. He was one of several. The Watts memos. Yeah, but there weren't many select people. It was so huge. Sure, but they were acquiring another company. And there were 11 other vice presidents that were let go at this time, in the spring of 2016. There were 10 employees in Mr. Cullen's department that were affected by the Watts memos. Plaintiff says he was singled out because he was sick. But 10 people were described in these two memos five months before anybody knew he was going to be sick. But his job was given to four people, two of whom were hired, correct? I think three people split up. The duties were largely split up among three people, yes. And shouldn't a jury hear this and hear the witnesses firsthand and decide for themselves what really motivated his firing? I mean, there was evidence that he could have done all the jobs that the other people were doing.  He'd asked for accommodations. I'm just curious about, you know, making a conclusion as a matter of law that there was no pretext here. It's because the Watts plans five months before he gets sick are clear in saying we're going to replace him. They don't say when. And the fact that they acted on it, they showed that it was a real decision. It was approved by his superior. Then we have Mr. Cullen's experience when he goes out. He wrote a thank you e-mail to the HR people saying thank you for the way you handled my benefits while I was out and helping my wife get through this. What does that show? That doesn't show anything. That's not Watts. Well, the question is animus. And this shows there's no animus. Well, on the part of the benefits people, but maybe Watts, who's making the decision, it's his animus that matters. But when he comes back, he requests the accommodation. He gets everything. They gave him an extra month when he got an infection and there was no problem. He was happy. He didn't complain about any. Well, Watts said he's been out for four months and he's been out only three months. Yes. And that's the kind of difference that Judge Prater didn't think was significant. I mean, he rounded it off in a discussion. The conversation about whether Randy Watts made any derogatory comments when he came back. When he came back, there was a meeting where Watts explained to the other people, Now, look, I assigned Mr. Watts, Mr. Cohen's responsibilities to you when he was out for four months. We're going to reassign them back to Fred Cohen now. That was the context of the conversation. It was totally benign. The fact that he had been out for four months was already known by all the people in the department. Then back to him. If earlier they had decided that they were going to eliminate his position. He was reassigning them because that the date of termination had not come yet. It was before that. And so they weren't going to have him. He was trying to get back to work. Had to be just days before. Just days before. He didn't give an actual time frame to that. We don't have a date. But it was within a few weeks, certainly. Maybe three weeks. And there's no attempt to find something else, or was there, for Cohen to do? No, because he was a real estate guy in a physical therapy company. His job was to handle leases and renovations when they would take over companies to handle these, getting these places up and running. He was taken out as head of the real estate department because they found a better way to do it. And they saved $20 million across the board on all these multiple decisions like this. But do we know from his $206,000 compared to these other people who were hired, I mean, four people ended up doing these jobs and two were hired. Judge Prater concluded that it was business, their money, their savings. Do we know that they really saved any money by hiring these people? Well, as I just said, there was a $20 million savings across the board, and that's documented. They didn't save money exactly. What they did was they got three employees instead of one, and it was instead of spending $206,000, they spent about $220,000. So is that a savings of money? In one sense, no. In another sense, you're getting three employees for one. And the one who handled most of his... They're all doing his job. Pardon me? They're all doing his job. Parts of it. His job had leasing, construction. He had different aspects to his job. So they hired one guy to do the construction because he had more blueprint reading experience. He had some architectural training. His name is Hillenbrand. And he took over most of the position for $60,000. And he had better skills at reading blueprints than the plaintiff did. Well, if that had come forth in the depositions, that would be interesting. But Watts keeps parroting this provide specific level of service, better service to our operations team. I don't know what that means. What that means is that they were buying these companies like NovaCare, like Physio, that had 1,000 outlets around the country, 500 outlets, and they needed to be renovated. So there was a lot of pressure on the real estate department to enhance their skills because of just such demand for getting these places up and running once they've been bought. And this is why. You know, if Fred wasn't capable of doing this and this guy came with this skill set, it just struck me as not very helpful. Why didn't you mention the July 2015 memo in the EEOC proceeding? The EEOC was defended.  And the company did not want to disclose. Remember, 10 employees of the real estate department, some of whom were still there, were affected by this. They didn't want to show their employees the inside of their personnel decision. There were still other people there that these memos affected. And until they saw it, well, the EEOC found no probable cause. They hoped it would end there. When it didn't, it came to court. We had to pull out all the stops, frankly, give it to a lawyer, and have a lawyer develop the arguments. That's why it wasn't argued in the EEOC. That's a preliminary step, and they really didn't want to show their whole personnel decision-making process to the employees that were named in the memo. I guess my guess is an argument can be made at closing, and the jury may accept it, they may not accept it. But really, all these things go to the same question, don't they? Is there evidence of a discriminatory intent? Is there a material issue of fact? There could be inconsistencies, implausibilities. There's a lot of things we can look at and consider whether a jury should hear them. And none of these things, even if you acknowledge that there are inconsistencies, none of these things change the fact that the Watts memos were written five months before. And if you read those memos and you see how the company followed up on them, implemented them, you can see that there was a plan and it was carried through, it was a decision. The timing of it, exactly when to terminate, was not. That's where the physio plan comes in. And how can we say... Was O'Connor a physio employee or was he already at Best Medical? You mean the plant? Patrick O'Donnell. I'm sorry, I can't hear. O'Donnell. Patrick O'Donnell. He came on as real estate manager. When did he come to? He came on before they bought physio in September of 15. And I think he was from inside. And what about Francis McCaffrey, inside also? Mikulich came from inside in August of 15. And McCaffrey, I think, came later, July of 16, I think, from physio. So the entire department basically was restructured. And this all flies in the face of Plaintiff's argument that he was singled out for discriminatory purpose. This was a big... There were between 100 and 130 people had their jobs changed or terminated. He was not singled out. Only eight select people. Correct, correct. But that's a lot of people to go at once. And they were from different departments. They weren't all in the real estate department. But doesn't every one of those employees, those job actions, show that Plaintiff wasn't singled out? This was a very big process. This was a business decision. And, of course, it's not the court's... The problem with looking at it that myopically is that it may well be that the reason he was one of the eight, not the 100, but the eight from your client, was because this guy wasn't that productive. The reason he wasn't that productive was he's going through the recovery from his cardiatric surgery. He has to work from home. He has reduced hours in terms of when he comes in. So that's... Since we need to restructure things anyhow, he should be part of that restructuring. Now, that would be a claim. But it wouldn't be a defense to say, well, the reason we included him in that was because he wasn't as productive. The reason he wasn't as productive was because of his medical situation. So that argument does not negate the fact that jury could still find discrimination. But the Plaintiff has the burden of showing that pretext, and they haven't come forward with any evidence except the circumstantial things that we've talked about. Well, so often that's exactly what you have. People have gone to death row on circumstantial evidence, probably more than on direct evidence. So the fact that there's only, quote, only circumstantial evidence is not really helpful. But none of it affects the fact that the decision is documented five months before he got sick. And the fact... The testimony is the decision wasn't made until the physio acquisition had occurred. Well, these employees that I've talked about were hired pretty much right away after the Watts memos in the next couple of months. That's an indication that the decision was made. You don't go spend more money on people when part of your intent is to save money. But McCaffrey was hired when? McCaffrey was July of 16. He was the third one that came later after the physio acquisition. After the acquisition. Who was hired before the acquisition? Mikulich was transferred, and O'Donnell, I believe, was hired. Why were O'Donnell, Richardson, and Hillenbrand?  O'Donnell was hired. When was he hired? I think it was the spring of 16. I forget which month. But it was all at about the same time. The spring of 16 is when most of these things, of these 130 or so people were transferred. I mean, that does point in your favor, but there are other things that go to the contrary. Your Honor, as far as the satisfactory performance or not is concerned, yes, it was something that they considered. It's mentioned in the Randy Watts memos that he's an acceptable employee, but they want excellence. I think the word he used in the memo was they want excellence because he's got a high salary. That's a business decision that they're entitled to make. It's also a business decision saying, listen, you're doing great, but we can't afford your salary. We're going to split up some of these people. We're going to take you down to 160 and hire some other people. You know, to work alongside you. But that was never done. It was eliminated and given to four other people, actually. Yes. I should point out that the background of this, as reflected in the President Bradley's deposition, is that these were multiple acquisitions that were being made over the last several years. And Plaintiff actually participated in four of them, according to his testimony, downsizing other companies as they were brought in, their real estate departments. If there are any other questions, I'm happy to address them. Thank you. Your Honor, as promised, the case that I think is most helpful is the Lichtenstein case, which appears on page 55 of plaintiff's or appellate's brief, 691 F3D at 310, 311. And in that case, the plaintiff was terminated seven days after taking FMLA leave, and the Court of the Third Circuit held that that was sufficient standing alone to defeat summary judgment. Also instructed is Kimes v. University of Scranton, 126 F sub 3D 477. And this is when the adverse action was taken 16 days after exercising her FMLA leave, supporting denial of employer's motion for summary judgment. Thank you. Thank you, counsel, for the argument. Thank you. Thank you. Thank you. Thank you. Thank you.